UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWEST AIRLINES CORPORATION, et al., | Case No. 05-17930 (ALG) |
| Debtors. | Jointly Administered |

-------------------------------------------------------------------x

| | |
|---|---|
| NORTHWEST AIRLINES CORPORATION, et al., | |
| Plaintiffs, | |
| -against- | Adv. Proc. No. 06-1679 (ALG) |
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, et al., | |
| Defendants. | |

-------------------------------------------------------------------x

## MEMORANDUM OF OPINION AND ORDER

A P P E A R A N C E S :

ARNOLD & PORTER, LLP
Counsel for the Debtors
  By:  Brian P. Leitch, Esq.
       Tim Atkeson, Esq.
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202
  By:  Kent A. Yalowitz, Esq.
399 Park Avenue
New York, New York 10022

CADWALADER, WICKERSHAM & TAFT LLP
Counsel for the Debtors
  By:  Bruce R. Zirinsky, Esq.
One World Financial Center
New York, New York 10281

GUERRIERI, EDMOND, CLAYMAN & BARTOS, P.C.
Counsel for the Association of Flight Attendants-CWA, AFL-CIO
  By:   Jeffrey A. Bartos, Esq.
1625 Massachusetts Avenue, N.W., Suite 700
Washington, D.C. 20036

ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO
General Counsel for the Association of Flight Attendants-CWA, AFL-CIO
  By:  Edward James Gilmartin, Esq.
501 Third Street, N.W., Ninth Floor
Washington, D.C. 20001

COHEN, WEISS & SIMON, LLP
Counsel for the Air Line Pilots Association, International
  By:  Richard M. Seltzer, Esq.
330 West 42nd Street
New York, New York 10036

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Counsel for the Official Committee of Unsecured Creditors
  By:  Brett H. Miller, Esq.
       Lorenzo Marinuzzi, Esq.
250 Park Avenue
New York, New York 10169

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court are two motions relating to the Court's grant of authority to

Northwest Airlines Corporation and its affiliated debtors (the "Debtors") to reject a

collective bargaining agreement with their flight attendants, now represented by the

Association of Flight Attendants-CWA ("AFA").  Pursuant to § 1113 of the Bankruptcy

Code, the Debtors have rejected the collective bargaining agreement and implemented

terms and conditions of employment consistent with the proposal made to the flight

attendants on March 1, 2006, the last proposal that was on the table prior to the Court's

decision authorizing rejection.  After the decision was rendered but before the rejection

became final, the parties made a further attempt to reach agreement, and although the

Debtors were able to reach agreement with the AFA leadership on July 17, 2006, the

agreement failed to be ratified by the union's membership.  Following the failed

ratification vote, the Debtors instituted the terms and conditions that the Court had

authorized in its rejection decision, and AFA followed with notice of its intent to engage

in strike activity.  AFA also moved for an order requiring the Debtors to substitute the

terms and conditions of the agreement it failed to ratify in July for those contained in the

March 1 Agreement and the Court's § 1113 order, and the Debtors moved for a

preliminary injunction enjoining AFA from engaging in strike activity or any other form

of economic self-help.

　　　　As an airline, Northwest Airlines Corporation is subject to the Railway Labor Act,

45 U.S.C. § 151 *et seq.* ("RLA").  With respect to the Debtors' motion for injunctive

relief, this is apparently a case of first impression regarding a union's right to take job

action against an RLA carrier in Chapter 11 following the carrier's rejection of the

union's collective bargaining agreement under § 1113 of the Bankruptcy Code.

### Background

　　　　The Debtors filed Chapter 11 petitions in this Court on September 14, 2005.  By

motion dated October 12, 2005, the Debtors sought an order pursuant to § 1113(c) of the

Bankruptcy Code permitting rejection of their collective bargaining agreements with six

unions, including the authorized representative of the flight attendants at that time, the

Professional Flight Attendants Association ("PFAA").  The Debtors settled with three of

the smaller unions without litigation.  After evidentiary hearings, comprising a total of

ten days of testimony, and protracted negotiations, the Debtors also reached agreements

3

with the Air Lines Pilots Association, International ("ALPA") and the International

Association of Machinists and Aerospace Workers ("IAM"), and agreements were

eventually ratified by the unions' memberships.  At each stage of the proceedings the

Court, with the parties' concurrence, delayed closing the record on the § 1113 hearing

and then delayed issuing a decision in order to afford the parties additional time to reach

a consensual resolution.

On March 1, 2006, the Debtors have been

unable to reach agreement with their 9,000 flight attendants.  On March 1, 2006, the

Debtors and the PFAA leadership reached an agreement (the "March 1 Agreement") that

was then submitted to the PFAA membership for an extremely lengthy process of

ratification, but the flight attendants voted down the accord by a margin of 4:1.  As a

consequence, the pending § 1113 Motion was put before the Court for decision.  Prior to

the Court's ruling on the § 1113 motion, the parties entered into a stipulation dated June

13, 2006, providing that the Debtors would not impose new terms and conditions of

employment before June 30, 2006, pursuant to either their rights under § 1113(d)[1] or a

decision authorizing rejection under § 1113(c).  The stipulation also provided that the

PFAA would not engage in any work stoppage or other self-help activity prior to the

imposition of new terms and conditions without giving at least fifteen days' notice to the

Debtors.

On June 29, 2006, the Court issued an opinion, finding that under § 1113,

rejection of the PFAA collective bargaining agreement was "necessary" to the Debtors'

ability to reorganize, that the union did not have "good cause" to refuse to accept the

---

[1] Section 1113(d) of the Bankruptcy Code provides that if the parties do not agree otherwise, the Court must rule on a rejection application within thirty days, or the debtor may terminate or alter any of the collective bargaining terms.  In this case the parties agreed to multiple extensions of the deadline.

proposal incorporated in the March 1 Agreement, and that the balance of the equities clearly favored rejection. *In re Northwest Airlines Corp.*, 2006 Bankr. LEXIS 1159, at *4-5 (Bankr. S.D.N.Y. June 29, 2006). At the hearings on the § 1113 motion, the Debtors had argued that an order allowing them to reject the PFAA collective bargaining agreement should authorize them to impose the terms and conditions of a proposal made to PFAA on February 22, 2006, the last offer on the table before the March 1 Agreement with the PFAA leadership had been reached. However, the Court held that in assessing the good faith and good cause requirements under § 1113, under the circumstances then present, it would require the Debtors to impose the terms of the March 1 "tentative agreement." Accordingly, the Court held that, following a fourteen-day period for further negotiations, the Debtors could institute terms and conditions of employment for the flight attendants not materially different from those described in the March 1 Agreement. Thereafter, on July 5, 2006, the Court entered an order authorizing the Debtors to implement such terms and conditions on July 17, 2006.

Concurrently, the flight attendants held a contested representation election with respect to their union representation, and following a vote, AFA succeeded PFAA as the flight attendants' certified bargaining representative on July 7, 2006. AFA immediately commenced bargaining, picking up where the PFAA had left off, and after ten days of non-stop negotiations, AFA reached a new tentative agreement with the Debtors on July 17, 2006 (the "July 17 Agreement"). In light of this new agreement, the Debtors refrained from imposing the new terms and conditions of employment that had been authorized by the Court's July 5 order. The July 17 Agreement was then sent out for an expedited vote by the AFA membership and apparently received the support of the AFA

leadership.  However, on July 31, 2006, the July 17 Agreement was also voted down,

albeit by a much closer vote of 55% to 45%.[2]

Acting pursuant to the Court's § 1113 order, on July 31, 2006, the Debtors then

unilaterally put into effect new terms and conditions of employment, substantially in

accord with those of the March 1 Agreement.  In response, on the same day, AFA gave

the Debtors fifteen days' notice of its intention to engage in work stoppages and other

self-help activity.  It also filed a motion seeking an order that if the Debtors imposed any

new terms and conditions of employment under § 1113, they should be obligated to

substitute the terms of the July 17 failed Agreement for those of the March 1 failed

Agreement.  On the next day the Debtors filed the instant motion to enjoin the threatened

strike activity, as well as any other form of self-help activity by AFA.  ALPA (together

with AFA, the "Unions") has intervened on the side of AFA.  The Debtors have also

opposed AFA's motion to require that the July 17 terms be substituted for the March 1

terms.

The Court held a one-day hearing on the issues raised by both parties.  The

testimony made it clear that the self-help strategy that AFA contemplates would have a

seriously adverse effect on the Debtors' prospects for reorganization and on the traveling

public generally.  AFA has planned a course of action under its trademarked and aptly

named acronym, CHAOS ("Create Havoc Around Our System").  As it has been applied

or threatened against other carriers, CHAOS results in sporadic and relatively brief work

---

[2] General counsel for AFA testified that the time period for the AFA membership to vote on the July 17
Agreement was limited to only ten or twelve days, a period shorter than the usual time frame for member
ratification of tentative agreements of a similar nature.  This limited period apparently made it more
difficult to reach some union members and convey information explaining the terms of the July 17
Agreement.  (Borer, Tr. 2.15, line 17 to 2.16, line 24.)

stoppages that are designed to create havoc with an airline's scheduling of flights and to cause the public to lose confidence in the ability of the airline to provide reliable service. At the same time, the program is designed to prevent the airline from attempting to replace striking workers or take other effective responsive action. The evidence of record is that the threat of CHAOS would likely cause the Debtors serious injury, perhaps leading to their liquidation, and that it would be highly detrimental to the interest of the public in a sound and reliable transportation system.[3]

As noted above, AFA gave the Debtors the required fifteen days' notice of its intent to take job action on July 31, 2006, allowing them to take such action on August 15, 2006. On August 11, 2006, in light of the terrorist threat and new security precautions put in effect in early August, AFA postponed the date to August 25, 2006.

### Discussion

The questions for decision are (i) whether the Debtors are entitled to a preliminary injunction enforcing the terms and conditions of the RLA and enjoining AFA and its members from work stoppages or other self-help activity; and (ii) whether AFA is entitled to an order requiring the Debtors to put into effect the terms of the July 17 Agreement rather than the March 1 Agreement.

### I. Debtors' Motion Seeking a Preliminary Injunction

In considering the Debtors' request for a preliminary injunction, it is necessary to start with the jurisdiction of this Court to grant any injunctive relief against a union's strike activity. There is no question that the anti-injunction provisions of the Norris-

---

[3] There is no question that the public interest is involved. The Debtors demonstrated, for example, that Northwest carries 130,000 passengers per day, it has 1,200 departures per day, it is the one carrier for 23 cities in this country and it provides half of all airline services to another 20 cities. (Showers, Tr. 1.33, line 16 to 1.34, line 4.)

LaGuardia Act, 29 U.S.C. § 101 *et seq*. ("NLGA"), generally divest the federal courts of

jurisdiction to enjoin strike activity in cases involving labor disputes.  29 U.S.C. §§ 101,

104.  Nothing in the Bankruptcy Code or in the policies of bankruptcy law overrides the

provisions of this statute.  In *Truck Drivers Local Union No. 807, IBT v. Bohack Corp.*,

541 F.2d 312 (2d Cir. 1976), a case under the prior Bankruptcy Act, the Second Circuit

held that the jurisdiction of a court of bankruptcy to protect an estate from possible

irreparable harm did not override or limit the NLGA proscription against enjoining a

strike.  No case under the Bankruptcy Code has suggested that the NLGA does not apply

in cases under the Bankruptcy Code or that it does not limit the power of this Court to

grant an injunction in the present circumstances.

There are also a number of cases that have assumed, without analysis, that a strike

is permitted after the rejection, pursuant to the provisions of the bankruptcy laws, of a

collective bargaining agreement.  See, e.g., *In re Royal Composing Room, Inc.*, 62 B.R.

403, 405 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 671 (S.D.N.Y. 1987), *aff'd*, 848 F.2d

345 (2d Cir. 1988) ("If the changes this Debtor imposes after rejection are unacceptable,

the employees are free to resign or strike."); *Briggs Transp. Co. v. Int'l Bhd. of

Teamsters*, 739 F.2d 341, 344 (8th Cir. 1984) (rejecting employer's request for injunctive

relief against union picketing after rejection); *In re Evans Prods. Co.*, 55 B.R. 231, 234

(Bankr. S.D. Fla. 1985) (stating that union would have the right to call a strike if

employer rejected its collective bargaining agreement); *In re Kentucky Sales, Inc.*, 52

B.R. 797, 806 (Bankr. W.D. Ky. 1985)  ("Following the rejection of a collective

bargaining agreement … the employees retain the right to strike as their ultimate

bargaining tool."); *In re Horsehead Indus., Inc.*, 300 B.R. 573, 587 (Bankr. S.D.N.Y.

2003) ("A strike is an inherent risk in every § 1113 motion ….").  Indeed, in *Truck
Drivers Local 807 v. Carey Transp.*, 816 F.2d 82, 93 (2d Cir. 1987), the Second Circuit
presumed the legality of a strike following rejection of a collective bargaining agreement
by including the "likelihood and consequences of a strike if the bargaining agreement is
voided" as one of the six factors to be considered in the balancing of the equities under §
1113.  However, all of the above cases involved labor contracts governed by the National
Labor Relations Act, 29 U.S.C. § 160 *et seq*. ("NLRA").  The law under the RLA is very
different, and while there are apparently several reported decisions in which courts have
mentioned, in passing, that unions have engaged in strikes against RLA carriers in
Chapter 11, none has considered the legal issue presented here.  See *Continental Airlines
Corp.*, 901 F.2d 1259, 1261 (5th Cir. 1990) (unions engaged in strike activity in response
to debtor's unilateral changes in terms and conditions of employment prior to a court-
approved rejection of the union's labor contracts); *IAM v. Eastern Airlines, Inc.*, 121 B.R.
428, 430-31 (S.D.N.Y. 1990), *aff'd*, 923 F.2d 26 (2d Cir. 1991) (union commenced strike
when the bargaining procedures mandated by the RLA had been exhausted); *In re Penn
Central Transp.*, 458 F. Supp. 1234, 1249 n.9 (E.D. Pa. 1978) (Bankruptcy Act case)
(same).

Turning to the provisions of the RLA, there is no question that the prohibition in
the NLGA against labor-related injunctions does not "deprive the federal court of
jurisdiction to enjoin compliance with various mandates of the Railway Labor Act."
*Burlington N. R.R. v. Bhd. of Maintenance of Way Employees*, 481 U.S. 429, 445 (1987)
(internal quotation omitted).  It is thus clear that a federal court can enter an injunction
against a work stoppage that violates the provisions of the RLA.  *Chicago & North*

*Western Ry. Co. v. United Transp. Union*, 402 U.S. 570 (1971); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n Int'l,* 238 F.3d 1300 (11th Cir. 2001).  The unions do not dispute this, although they argue that such injunctions have been issued sparingly and usually only where an explicit command of the RLA is being violated, such as the RLA's prohibition against striking over a "minor" dispute.  See *Brotherhood of R. Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30 (1957); *Chicago & North Western Transp. Co. v. Ry. Labor Executives Assoc.*, 855 F.2d 1277, 1287 (7th Cir. 1988); *Switchmen's Union of North America, AFL-CIO v. Southern Pacific Co.*, 398 F.2d 443 (9th Cir. 1968).[4]  Be that as it may, there are many decisions in which the federal courts have enjoined parties' compliance with the terms of the RLA.

The RLA is aimed at maintaining uninterrupted transportation operations and imposes a duty upon the employer and the union to bargain in the event of a labor dispute.  Under Section 2 (First) of the RLA, which applies during all phases of the collective bargaining process, carriers and unions must "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes."  45 U.S.C. § 152.  Courts have interpreted this section to mean that a union may not engage in self-help during the period when the parties are negotiating the union's first collective bargaining agreement.  However, a carrier has the right during such period to unilaterally set or alter the terms and conditions of employment, provided it engages in good faith negotiations.  *AMFA v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90 (2d Cir. 1995) ("*Atlantic Coast I*"); *AMFA v. Atlantic Coast*

---

[4] The RLA distinguishes between major disputes, which involve a new collective bargaining agreement or modifications to an existing agreement, and minor disputes, which involve grievances or the interpretation or application of the existing collective bargaining agreement.  See *Consolidated Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302-04 (1989); *Elgin v. Burley*, 325 U.S. 711, 723 (1945).

*Airlines*, 125 F.3d 41 (2d Cir. 1997) ("*Atlantic Coast II*"); *Atlas Air, Inc. v. ALPA*, 232 F.3d 218 (D.C. Cir. 2000).

Section 6 of the RLA, which does not apply in the absence of a collective bargaining agreement but comes into play once a collective bargaining agreement is in effect, *Atlantic Coast I*, 55 F.3d at 93, sets forth a mandatory bargaining process with regard to "major" disputes between the union and the carrier.  Under Section 6, the parties may not alter the status quo without first complying with the following procedures.  The party proposing to modify the status quo established by a collective bargaining agreement must give the other party thirty days' written notice of its intended changes.  Thereafter, the parties must bargain in good faith with regard to the proposed modifications.  If the parties are unable to negotiate mutually satisfactory modifications to the collective bargaining agreement, either party may invoke mediation by the National Mediation Board (the "NMB").  The NMB has authority to mediate for an indefinite period of time, during which the carrier may not change working conditions and the union may not declare a strike or engage in other disruptive action.  The NMB may recommend arbitration if it determines that the parties have reached an impasse and further mediation would be futile.  If either party refuses arbitration, and the dispute threatens to substantially interrupt interstate commerce, the NMB must notify the President, who may create an Emergency Board to investigate and report on the dispute.  If one or both parties refuse arbitration and the dispute does not threaten to substantially interrupt interstate commerce, the parties must still go through a mandatory thirty-day cooling off period before the status quo is lifted.  At that time the carrier may implement

its proposed modifications to the collective bargaining agreement, and the union is free to engage in self-help activity.  45 U.S.C. § 155-57, 160.

The requirements of the RLA have been held to impose "virtually endless 'negotiation, mediation, voluntary arbitration, and conciliation.'"  *Burlington*, 481 U.S. at 454, quoting *Detroit & Toledo Shore Line R. Co. v. Transportation Union*, 396 U.S. 142, 148-49 (1969) ("*Shore Line*").  It is clear that if either the Debtors or AFA violated their obligations under the RLA, an injunction could lie.  It is also clear that in a case arising under the RLA, irreparable harm, which is a usual requirement for injunctive relief, is presumed from the threat of an illegal strike. See *Consol. Rail Corp.*, 491 U.S. at 303.

Citing *Atlantic Coast II*, the Debtors argue that rejection under § 1113 puts them in the same position as if they had no collective bargaining agreement at all and were negotiating a first-time agreement with the workers' representatives.  They point out that in *Atlantic Coast II*, the Second Circuit held that the union could not strike during good faith negotiations for a first collective bargaining agreement under the RLA, and that the carrier did not breach its duty to negotiate in good faith when it unilaterally changed terms and conditions of employment.  125 F.3d at 44.

The Unions, on the other hand, dispute the Debtors' analogy, contending that the flight attendants and the Debtors have had collective bargaining agreements since 1948 and that the rejected agreement is simply breached by virtue of rejection, not eradicated altogether.[5]  Rather, the Unions claim that the Debtors' rejection of the AFA collective bargaining agreement places the parties in the position they would have been in had they exhausted the RLA's mandatory bargaining procedures under Section 6.  Alternatively,

---

[5] There is authority under the Bankruptcy Code that rejection of an executory contract is in effect a breach and that the contract does not by virtue of rejection cease to have any legal force or effect.  See *In re Cont'l Airlines*, 981 F.2d 1450, 1459 (5th Cir. 1990); see also 11 U.S.C. § 365(g).

the Unions argue that they are in the middle of the Section 6 process because the NMB
has not released the parties from mediation, and that the Debtors' unilateral imposition of
terms and conditions, even if permissible by virtue of § 1113(c), constitutes action under
the RLA that triggers their right to resort to economic self-help.

The duty of this Court is to give effect to the Bankruptcy Code and the RLA to
the greatest extent possible.  As the Supreme Court said in a case in which it had to
reconcile the RLA with the Interstate Commerce Act, "We should read federal statutes
'to give effect to each if we can do so while preserving their sense and purpose.'"
*Pittsburgh & Lake Erie Railroad Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 510
(1989), quoting *Watt v. Alaska*, 451 U.S. 259, 267 (1981).  In *Brotherhood of Railraod,
Airline, and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir. 1975), the
Circuit Court considered whether a debtor in a case under Chapter XI of the prior
Bankruptcy Act should be able to reject a collective bargaining agreement governed by
the RLA.  The Court held that its duty was to reconcile the provisions of the RLA, which
mandate an almost endless course of negotiation and mediation, with the right of a debtor
in bankruptcy to reject an executory contract.  The Court first said, "Faced with this
apparent conflict in the language and purposes of the RLA and the Bankruptcy Act we
must give effect to both statutes to the extent that they are not mutually repugnant."  *REA
Express*, 523 F.2d at 169.  It found that, "Unless the debtor-in-possession is permitted to
act promptly, albeit unilaterally, in avoiding onerous employment terms that will prevent
it from continuing as a going concern, the enterprise, and with it the employment of its
workers, may fail."  *Id.* at 170-71.  The Court concluded that notwithstanding the RLA, a
debtor in possession had the right under the bankruptcy laws to reject a collective

bargaining agreement.  Although *REA Express* arose under the prior Bankruptcy Act, the right of a debtor under the Bankruptcy Code to reject a labor agreement was recognized by the Supreme Court in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 526 (1984), and has since been codified in § 1113 of the Bankruptcy Code.

In *REA Express*, the Second Circuit also considered the effect of rejection on the rights of both the employer and the union.  Citing *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 277-81 (1972), the Court found the debtor in possession to be in the same position as a successor employer, not bound to assume the collective bargaining agreements of its predecessor but "obligated to bargain collectively with the representative of the employees hired by it."  *REA Express*, 523 F.2d at 170.  It then considered whether, in addition to bargaining with the employees, "the debtor-in-possession, as a new employer, is also obligated to maintain the status quo, i.e., adhere to the terms and conditions of employment presently in effect pending negotiations with the unions for collective bargaining agreements."  *Id.*  The Court held that a debtor was not so bound, just as the successor employer in the *Burns* case "had no obligation to refrain from changing the terms of employment before such bargaining occurred."  *Id.*

The decision in *REA Express* and the Court's citation to *Burns* provides some support to the Debtors' argument that they are, in effect, in the position of a new employer and that, under *Atlantic Coast II*, an employer can change terms and conditions of employment during good faith negotiations for a first collective bargaining agreement under the RLA and can obtain injunctive relief under Section 2 (First) of the RLA to require the union to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes."  45

14

U.S.C. § 152.  However, the Court in *REA Express* did not expressly or impliedly

consider the obligation of a union to bargain after a rejection order or its right to strike or

take other self-help measures in the event that the employer changed the terms and

conditions of employment.  Moreover, the conclusion of the decision in *REA Express* is

inconsistent with the Debtors' position and indicates that the bargaining required of the

parties should take place before, not after, the changes in terms and conditions of

employment that follow the rejection order are finally put in place.  The Court said of a

debtor that has rejected a labor agreement governed by the RLA, "Where its employees

are represented, as here, by collective bargaining representatives, it is obligated merely to

give reasonable notice of its proposed terms and to negotiate in good faith for a

reasonable length of time before putting them into effect."  *Id.* at 171.

  *REA Express* was written in 1975, before the adoption of the Bankruptcy Code

and before the adoption of § 1113, which set forth for the first time explicit rules to

govern the rejection of a collective bargaining agreement in bankruptcy and the

establishment of new terms and conditions of employment.  But the above statement,

requiring the employer to give reasonable notice of the proposed terms and to negotiate in

good faith for a reasonable period of time before putting them in place, is a fair summary

of § 1113's procedural requirements.  Before a debtor can reject a collective bargaining

agreement, it must make a proposal to the authorized representative of the employees

containing only modifications "necessary to permit the reorganization of the debtor" and

that will assure "that all creditors, the debtor and all of the affected parties are treated

fairly and equitably"; provide all necessary relevant information to the employees'

representative; and bargain in good faith.  11 U.S.C. § 1113(b).  The court can approve an

application for rejection only if a debtor has made such a proposal, the employees' authorized representative has refused such proposal without good cause, and the balance of the equities clearly favors rejection.  11 U.S.C. § 1113(c).  In its June 29 decision the Court found that the Debtors had satisfied each of the requirements of § 1113 and that they could institute the last proposal they had made that the employees' representative had refused to accept without good cause.

The Debtors argue that they are in the position of a new employer without a prior collective bargaining agreement and that they can enforce, by injunctive relief, the obligation of the employees and their representative to bargain in good faith toward the formulation of an agreement.  The purpose and effect of § 1113, however, is to limit the modifications that an employer can make to an existing collective bargaining agreement, provide for a limited period of negotiations, and then permit the debtor to reject an existing agreement and put in place new terms and conditions of employment and bring the process to a conclusion.  The Debtors recognize this clearly when they argue, in response to AFA's application to have the Court impose the terms of the failed July 17 Agreement rather than the March 1 Agreement, that the § 1113 order is final and conclusive and that the Court does not have any obvious authority to alter it.  There is thus nothing in § 1113 that suggests that rejection should trigger an implied obligation on the part of the parties to continue to bargain.

In a post-hearing submission, the Debtors argue that this obligation is inherent in the RLA and cite as controlling *Chicago & North Western Ry. Co. v. United Transportation Union*, 402 U.S. 570 (1971).  The Debtors contend that the Supreme Court held there that the Section 2 (First) obligation to bargain in good faith applies at the

beginning, middle and end of the RLA process and even when Section 6 negotiations have been exhausted.  In their Reply Brief, the Debtors earlier cited *Chicago & North Western Ry. Co.* for a more limited proposition, that "section 2 (First) prohibits a party from engaging in the Section 6 process with 'a desire not to reach an agreement.'" (Reply Brief at 8-9, quoting 402 U.S. at 578.)  That is exactly what the Supreme Court held in that case, finding that "the strictest compliance with the formal procedures of the Act is meaningless if one party goes through the motions with a desire not to reach an agreement," and remanding for a determination of the factual issues involved.  402 U.S. at 578 (internal citations omitted).  *Chicago & North Western Ry. Co.* is not controlling here.  The Debtors have not contended on these motions that the union never had a desire to reach an agreement and never bargained in good faith in accordance with its obligations under Section 2 (First).  Nor could this contention be made.  Passing the months of negotiations between the predecessor union and the Debtors, AFA commenced round-the-clock negotiations on the day it was certified and reached a new agreement with the Debtors in a ten-day period, a period set by the Debtors.  The July 17 Agreement failed of ratification by only a narrow margin after an expedited and perhaps too abbreviated voting process.  It cannot be said that AFA refused to bargain in good faith, and it bears emphasizing that its threats of CHAOS followed the Debtors' imposition of new terms and conditions of employment.

The foregoing is not to say that the Debtors acted in bad faith when they imposed the terms and conditions of the March 1 Agreement.  Section 1113(b) recognizes that the parties should, if possible, negotiate modifications to an existing collective bargaining agreement.  The Court held open the record in the § 1113 hearings for several months in

order to give the parties additional time to negotiate and stated on many occasions that a

negotiated resolution was far better than one imposed by a court.  Eventually, however,

the Debtors insisted on a decision, as is their right under the statute, and they then put

into effect their last offer to the employees' authorized representative that had been

turned down without good cause, as is also their right under the statute.  But it cannot be

said that the union's response to this action was, as a matter of law, in bad faith or that

the Debtors' action triggered an obligation on the part of the employees under the RLA to

begin bargaining all over again, as if this were a first-time contract.

If AFA had put its CHAOS program in effect prior to the Debtors' imposition of

new terms and conditions of employment, we would have a very different case, and the

Debtors might well be entitled to injunctive relief requiring the union to comply with

their obligations to bargain in good faith under Section 2 (First).  If the Debtors reinstated

the status quo as it existed prior to July 31, and the union refused to bargain in good faith,

the Debtors might be entitled to injunctive relief under the RLA, especially as the NMB

has not released the parties from their obligations to negotiate.

Nevertheless, the Debtors decided to act.  If there were an apt analogy under the

RLA to the action of an employer in instituting new terms and conditions of employment

after a § 1113 order, it would be to an employer's unilateral action in changing the status

quo that in turn frees the employees to take job action.  As the Supreme Court has

described the Railway Labor Act,

> It imposed upon the parties an obligation to make every reasonable effort
> to negotiate a settlement and to refrain from altering the status quo by
> resorting to self-help while the Act's remedies were being exhausted....
> The Act's status quo requirement is central to its design.  Its immediate
> effect is to prevent the union from striking and management from doing
> anything that would justify a strike.  In the long run, delaying the time

18

> when the parties can resort to self-help provides time for tempers to cool,
> helps create an atmosphere in which rational bargaining can occur, and
> permits the forces of public opinion to be mobilized in favor of a
> settlement without a strike or lockout.

*Shore Line*, 396 U.S. 142, 149 (1969). Nevertheless, the Court further held that if the status quo were changed, the other party would have a correlative right to take action. "Only if both sides are equally restrained can the Act's remedies work effectively." *Id.* at 155. Section 1113 of the Bankruptcy Code gives the employer a right to change the status quo and institute new terms and conditions of employment. But if it exercises this power it cannot bind the union anew to the almost endless requirements of negotiation and mediation provided for in the RLA.

The inability of an employer to compel union members to continue negotiations and refrain from self-help after the rejection of a collective bargaining agreement does not necessarily leave a debtor free of any remedy. The NLGA restricts the ability of the federal courts to grant injunctions against certain labor activity. The parties have not briefed the ability of the bankruptcy courts to provide other relief against a party that is attempting, by its own account, to inflict economic damage on an employer and prevent the institution of changes to a collective bargaining that have been found "necessary" to the debtor's reorganization. For example, the Court's § 1113 decision was based on the circumstances present at the time it was rendered; the Court found specifically that it would not be equitable to permit the Debtors to impose the terms offered on February 22 rather than those agreed to with the leadership of PFAA on March 1. *In re Northwest Airlines Corp.*, 2006 Bankr. LEXIS 1159, at *56-57. AFA's CHAOS strategy may well change the equities. Similarly, no party has argued that the Bankruptcy Court is without

power to put in effect interim, essential changes to terms and conditions of employment

under § 1113(e) of the Bankruptcy Code prior to the rejection of an existing contract.

In conclusion, the Court must find that it does not have jurisdiction to grant the

Debtors the injunctive relief they have sought in the pending motion.  This conclusion

also answers the Debtors' argument that this Court should grant a preliminary injunction

because they have demonstrated "(a) irreparable harm and (b) either (1) likelihood of

success on the merits or (2) sufficiently serious questions going to the merits to make

them a fair ground for litigation and a balance of hardships tipping decidedly toward the

party requesting the preliminary relief."  *Long Island R.R. Co. v. Int'l Ass'n of

Machinists*, 874 F.2d 901, 910 (2d Cir. 1989) (citation omitted).  In this case, the

preliminary issue is one of jurisdiction, not whether the Debtors have satisfied the

requirements for a preliminary injunction.  While a court has the authority to determine

its own subject matter jurisdiction, it may not grant injunctive relief where it concludes

that it has no jurisdiction to do so.  *Wagner Seed Co. v. Daggett*, 800 F.2d 310, 314 (2d

Cir. 1986); *Small v. Kiley*, 567 F.2d 163, 164 n.1 (2d Cir. 1977); *Del. and Hudson Ry.

Co. v. Consol. Rail Corp.*, 533 F. Supp. 692, 694 (N.D.N.Y. 1981).  Since the Court has

concluded that the NGLA removes its jurisdiction to enjoin the strike activity at issue, the

requested relief cannot be granted on the premise that the Debtors need only show

"serious questions going to the merits."

## II.  AFA's Motion Seeking a Substitution of Terms and Conditions of Employment

AFA has moved for an order requiring the Debtors to institute the terms and

conditions of the July 17 Agreement rather than the March 1 Agreement.  The Debtors

object, arguing that the Court's § 1113 order is final and that it would be bad policy to

require an employer to "implement every successive agreement it reaches with its union,

even when those agreements are rejected by the membership and the court decisions are

final…. Union members would face no risk in rejecting a [tentative agreement], and a

rational debtor would soon realize that continued negotiations may not only provide no

benefit to the company, but could harm the debtor's chance of achieving the labor cost

savings necessary to reorganization." (Debtors' Response to Motion of AFA at 7.)

On the present record, the Debtors are certainly correct. Assuming that the Court

has the power to alter or amend a § 1113 order, for cause shown, AFA has not shown

cause to obtain the relief it seeks. If AFA argued that imposition of the July 17 terms

would create the framework for a consensual resolution and avoid a strike – which is

exactly what PFAA represented when it argued for imposition of the March 1 Agreement

rather than the February 22 offer – it would at least proceed from a more equitable

position. But AFA is, at the moment, planning to damage the Debtors' chances of

reorganization despite a finding that the changes proposed are "necessary" to that

reorganization. AFA offers nothing in response to the Debtors' contention that

negotiations without a downside are not poised for success. The Court may not have the

power to enjoin CHAOS, but it does not have to reward it.[6]

### Conclusion

For the reasons stated above, an injunction would not give effect to the terms and

conditions of the RLA in the context of the Debtors' exercise of their right to reject a

collective bargaining agreement with the flight attendants and implement new terms and

conditions of employment. The Court accordingly does not have jurisdiction to grant

---

[6] The Court recognizes that on August 11, 2006, in response to the security alert imposed the day before, AFA postponed its CHAOS campaign for ten days. Again, both parties would benefit from a cooling-off period, but the Court cannot impose one unilaterally.

such an injunction on the present record.  The Court will not grant AFA the extraordinary

relief it seeks and require the Debtors to substitute the terms and conditions of the July 17

Agreement for those of the March 1 Agreement that were authorized by order entered

July 5, 2006.

The Court recognizes that the foregoing decision is one of first impression and

that it raises issues of great urgency and significance to the parties and to the public.

Accordingly, it has "so ordered" this decision so that either party can expedite an appeal

if so advised.

IT IS SO ORDERED.

Dated: New York, New York
       August 17, 2006

_____/s/ Allan L. Gropper_____
UNITED STATES BANKRUPTCY JUDGE